2012 Ark. App. 154

**Michael LEWIS and Lisa Gragg, Appellants**

v.

**ARKANSAS DEPARTMENT OF HUMAN SERVICES, Appellee.**

No. CA 11–1067.

Court of Appeals of Arkansas.

Feb. 15, 2012.

Deborah Ruth Sallings, Little Rock and Janet Renee' Lawrence, Conway, for appellant.

Keith L. Chrestman, Jonesboro and Tabitha Baertels McNulty, Little Rock for appellee.

CLIFF HOOFMAN, Judge.

Appellants Lisa Gragg and Michael Lewis appeal from the order of the Sebas-

tian County Circuit Court terminating their parental rights to their two children, M.L.[1] and Z.L. Gragg's attorney has filed a no-merit brief and a motion to withdraw as counsel pursuant to Rule 6–9(i) of the Rules of the Arkansas Supreme Court and Court of Appeals and *Linker–Flores v. Arkansas Department of Human Services*, 359 Ark. 131, 194 S.W.3d 739 (2004). The clerk of this court mailed a certified copy of counsel's motion and brief to Gragg, informing her of her right to file pro se points for reversal; however, the postal service was not able to deliver the package due to an incorrect address, and it was returned. Lewis's counsel has filed a separate merit brief, arguing on appeal that the trial court's decision to terminate his parental rights was not supported by sufficient evidence. In Gragg's appeal, we grant counsel's motion to withdraw and affirm the termination order. With regard to Lewis's merit appeal, we reverse and remand.

On May 16, 2010, M.L. (DOB 10/23/03) and Z.L. (DOB 1/11/09) were taken into DHS custody after a report was made to the police that six-year-old M.L. was playing outside unattended. According to the affidavit attached to the petition for emergency custody, the police contacted DHS after M.L. was found alone in his apartment, which was filthy and environmentally unsafe for children. DHS was advised by M.L. that his sister, Z.L., was with a neighbor in another building. This neighbor told the DHS worker that, according to Gragg, M.L. was allowed to play outside because the security officer had said it was fine. The security officer, however, denied this and stated that M.L. was always outside unsupervised. DHS exercised a sev-

enty-two-hour hold on the children at that time.

The order for emergency custody was entered on May 19, 2010, and a probable-cause hearing was held on May 21, 2010. The trial court found that probable cause existed to support removal of the children and that the children should remain in the custody of DHS but authorized a trial placement with Gragg. Gragg identified the father of both of the children as Lewis, who was also present at the hearing, stating that the parents had previously lived together, although they were never married. Lewis was ordered to undergo genetic testing to confirm paternity of Z.L. The court also ordered that DHS conduct weekly drug and alcohol screening of Gragg.

The adjudication hearing was held on July 15, 2010. The trial court noted that a trial placement of the children had been permitted at the previous hearing based on photos introduced by Gragg, which had shown that her home was clean and in an appropriate state. However, one week after the children were returned, the court stated that Gragg's home was again in a "deplorable" condition. According to the DHS report entered into evidence at the hearing, DHS had been notified that Gragg appeared to be under the influence, and when the worker arrived, empty beer cans were found throughout the dirty home. Gragg was also arrested at that time on two old warrants for alcohol-related charges. The children were removed from the home for a second time and placed in foster care. The trial court found the children dependent-neglected based on environmental neglect, inadequate supervision, and parental unfitness due to Gragg's alcohol-abuse issues. The

---

1. M.L. is also referred to in certain briefs and documents in the record as G.L., due to his middle name.

court ordered weekly visitation with each parent and set the goal of the case as reunification. Gragg was ordered to complete parenting classes; maintain stable and appropriate housing, income, and transportation; submit to a psychological evaluation and follow any counseling recommendations; submit to a drug/alcohol assessment and complete any recommended treatment; continue counseling and medication management; submit to weekly substance screens; and to visit the children regularly. Gragg was also ordered to have no alcohol in her home and to completely refrain from the use of alcohol.

At the August 2010 review hearing, the trial court ordered that DHS continue to screen Gragg for alcohol weekly and that she not be provided with advance notice of the days and times for these screenings. The court further ordered that DHS prepare a case plan for ₄Lewis and that it follow up on the genetic testing. A DHS report introduced at this hearing noted that Lewis was requesting that the children be placed with him and that a home study would be conducted as soon as he obtained a home more appropriate than his current one-bedroom apartment.

Another review hearing was held in December 2010, and a paternity order was also entered at this time, finding that Lewis was the biological father of Z.L. Both parents were ordered to pay weekly child support of $72 for the children. Concurrent goals of reunification and termination/adoption were set by the court. Gragg was found to have complied with the case plan by maintaining housing and by submitting to a drug/alcohol assessment, a psychological evaluation, and two alcohol screenings. However, she had failed to maintain sufficient income or reliable transportation, attend counseling or take prescribed medication, visit the children regularly, complete substance-abuse treatment, comply with the terms/conditions of her plea agreements, be available for homemaker services, or submit to the majority of her alcohol screens. The court further ordered that Gragg attend at least two AA meetings per week until she was accepted into substance-abuse treatment and that DHS verify that Gragg was in fact on the waiting list at Gateway. Lewis was ordered to complete parenting classes and to demonstrate improved parenting skills; to submit to a psychological evaluation; to maintain stable and appropriate housing, transportation, and sufficient income; and to visit the children regularly.

On May 10, 2011, DHS filed a petition to terminate Gragg's and Lewis's parental rights, alleging that the children had been adjudicated dependent-neglected and had continued ₅in an out-of-home placement in excess of twelve months, and despite a meaningful effort by DHS to rehabilitate the parents and correct the conditions causing removal, the conditions had not been remedied by the parents. The permanency-planning hearing was held on May 12, 2011, and the court found that it was in the children's best interest for the goal of the case to be changed to termination/adoption. The parents were also found in contempt for child-support arrearages in the amount of $1,312.72 for Gragg and $1,563.41 for Lewis.

The termination hearing was held on June 24, 2011. Lewis testified that he was currently renting a room in someone's home and that he had been living there for approximately one year, although he admitted that he had never given DHS this particular address. He did not agree that he was unable to provide his children with an appropriate home at that time, stating that he was planning on moving to Texas where he had family and that he had been promised employment there. He could

not remember the name of the employer, although he indicated that it was a railroad company. Lewis testified that he had been unemployed since 2009 but that he had been going to school for the past two years and had received a certificate to operate heavy machinery. He stated that he had applied for numerous job openings but that he had not been offered employment, and that he supported himself with the assistance of friends and family.

As far as compliance with the case plan and court orders, Lewis stated that he had completed his parenting classes and a psychological evaluation and that he also had reliable transportation. Lewis admitted to testing positive for marijuana the week prior but stated that it must have still been in his system from the last time that he had used the drug, approximately sixty days earlier. He also admitted that he refused to take a drug test in April and that he had failed another drug test in February. Lewis further stated that he did not know if he would pass a drug test if he were asked to take one for a new job. He admitted that he had not been visiting the children regularly but stated that his back had been hurting, that he had been refused a visit due to a failed drug test, that he missed several visits because of snow, that he had been out of town attending school, and that he had been sick on several occasions. He admitted that, lately, he had not had a chance to notify DHS when he had to miss a visitation and that he had not visited the children at all since January.

Regarding his relationship with Gragg, Lewis testified that they started dating in 2001 when they lived in Louisiana and that he had to take Gragg to the hospital for extreme alcohol abuse approximately nine years ago. However, after she became pregnant with M.L., Lewis stated that Gragg quit drinking and that she maintained sobriety until after the children were taken away in May 2010. He testified that they stopped living together after they moved to Fort Smith but that he still came to Gragg's house almost every day to see the children and to help her out by taking them to school. He stated that Gragg was a good mother to the children until the allegations in this case arose. Lewis requested that the trial court give him more time to attempt to reunify with his children, and he stated that if he could get a job immediately, he would be able to obtain an appropriate home for the children within a couple of months. He testified that he had attempted to obtain appropriate housing from the beginning of the case but that he had been turned down for assistance due to a thirty-year-old felony conviction for aggravated robbery. Lewis further admitted that he was not current on child-support payments for his two other children in Texas.

The next witness to testify was Gragg, who stated that she was currently in residential treatment at Gateway for her alcoholism. She testified that she entered the program on May 19, 2011, and that she expected to be discharged on June 30. Gragg stated that she had signed a lease for a three-bedroom home and that her mother would assist her in paying the rent until she found employment. She also stated that she had applied for HUD assistance, which she had received in the past.

When asked why she had waited until the month prior to the termination hearing to enter treatment for her alcohol issues, Gragg claimed that she had initially been on a waiting list for outpatient treatment but was never contacted by Gateway. She admitted that she had been referred for residential treatment in April and that she had been scheduled by DHS to enter treatment on May 12 but stated that she did not go because a court hearing was

scheduled for that day. Gragg further admitted that she had not been to any AA meetings, as had been ordered by the court, and blamed her inaction on her alcoholism and on not understanding the court order. She testified that she had been admitted to the hospital twice within the past year when she overdosed on alcohol, that she had shown up at an August court hearing extremely intoxicated, that she had been arrested for public intoxication on several occasions, and that she could not remember many details about these events. According to Gragg, she had been through residential treatment nine or ten years ago as part of a DWI plea agreement but then relapsed before M.L. was born. She testified that she had remained sober until her children were removed for the second time in May 2010. Gragg believed that she could maintain her sobriety after her current treatment ended because she now had the support network that she needed. She stated that she would ideally like to enter a ninety-day "Specialized Women's Services" program, where her children could also reside with her and she could receive further supervision after her current treatment ended.

Regarding her compliance with the case plan and court orders, Gragg testified that she had not yet completed her parenting classes, although she had only four classes remaining; that she had not undergone the majority of her alcohol screens; that she did not currently have a stable and appropriate home for the children; that she had not paid child support as ordered; and that she did not currently have reliable transportation, stable employment, or sufficient income. Gragg stated that she had a potential job lined up after she completed her treatment, although she admitted that she did not actually have an offer of employment. She also admitted that she had previously had her parental rights terminated in Crawford County to another child.

Sherry Lynn, the apartment manager at Gragg's previous apartment, testified that Gragg was recently evicted because of ongoing issues with parties, lots of visitors, calls to security, broken windows, and the filthy condition of her apartment. Lynn testified that she had notified HUD about the lease violations and that the eviction could make Gragg ineligible for further housing assistance. She also stated that Gragg still owed money for the apartment and that her belongings were still inside, despite requests that she retrieve them.

Robbie McKay, the DHS caseworker, testified that she was assigned the case from another caseworker in August 2010 and that it was her understanding that the issues that needed to be remedied were Gragg's need for alcohol treatment and both parents' need for stable housing and employment, sufficient income, and transportation. She stated that, despite arranging weekly alcohol screens for Gragg and transportation to and from these screens, Gragg underwent only nine out of twenty-eight that were scheduled. In addition, McKay stated that she randomly screened Gragg prior to two visits with the children and that she tested positive on both of those occasions, in February and March 2011. Not including the times that visits were cancelled due to weather or Gragg's positive alcohol screens, McKay testified that Gragg was present at eighteen out of twenty-five visitations since January 2011.

With regard to Gragg's alcohol treatment, McKay stated that DHS referred her for an assessment in May 2010, which Gragg completed in July 2010. Based on this evaluation, Gragg was recommended for outpatient treatment and was placed on a waiting list until October 2010, at which time Gateway tried unsuccessfully to contact her. After Gragg's hospitalizations

and intoxication at a court hearing, Gateway thereafter changed its recommendation to residential treatment, and another referral was made in March 2011; however, McKay testified that Gragg still did not contact Gateway to schedule an intake appointment. Therefore, in April, McKay made an appointment for her for the first available date of May 12, 2011, which she testified that she did not realize at that time was also a scheduled court-hearing date.

With regard to Lewis's compliance, McKay testified that she was never able to contact him at the one-bedroom apartment where he had indicated that he resided and that he never told her that he had moved to his current address. She stated that he was unable to provide an appropriate home for his children at that time and that he did not have sufficient income, instead relying on the charity of others. McKay admitted that Lewis had completed his parenting classes and a psychological evaluation but stated that he had not been cooperative with DHS and that he had been defiant and difficult to obtain information from. She also did not think that Lewis's plan to move to Texas, find a stable home and employment, and regain custody of his children within two months was a reasonable expectation. McKay stated that Lewis had visited the children on only five out of twenty-five occasions since January, excluding the visits that had to be cancelled on account of weather or by DHS, and that he had failed two drug tests and refused to take another one.

McKay recommended that parental rights be terminated and that the goal be changed to adoption. Based on her seventeen years of experience in hundreds of cases, McKay opined that the children were adoptable and could be placed together. Although the children had some disabilities and other issues, she did not feel that these issues would prevent their adoption. She testified that the children's behavior had improved since they were removed and that she was concerned about potential emotional and physical harm if they were to be returned home. McKay thought that the children would regress without the structure and stability they had gained outside Gragg's home. In addition to Gragg's longstanding alcohol problems, McKay testified that both parents' defiant and oppositional attitudes throughout the majority of the case were concerning. Although she had seen a positive change in Gragg within the past month, McKay stated that it would take a minimum of several months after she had completed treatment and obtained an appropriate home and employment before she could demonstrate sufficient stability to regain custody. McKay testified that she was not aware of any additional services that DHS could have provided to assist in the parents' reunification efforts and that they were still at "day one" after more than one year into the case.

At the conclusion of the hearing, the trial court found by clear and convincing evidence that DHS had proved the ground alleged in its petition and that it was in the children's best interest that Gragg's and Lewis's parental rights be terminated, specifically considering adoptability and potential harm to the children if returned home. The court made the following findings in support of its order: Gragg had no stable housing or income; she had paid no child support despite expending money on alcohol and cigarettes, which showed that her own desires took precedence over the well being of her children; she was not in compliance with court orders, such as completing parenting classes, attending counseling, submitting to weekly alcohol screenings, and attending AA meetings; she had waited until more than one year

had passed before entering residential alcohol treatment; her continued alcohol-addiction issues constituted a great risk of harm to the children; and due to her prior history of failure in treatment, there was little likelihood that she could be reunified with her children within a reasonable time frame. The court found that Lewis lacked stable, appropriate housing and sufficient income to support the children; he had not paid child support as ordered; he had not visited the children regularly; he had tested positive for drugs as recently as June 2011; his testimony lacked credibility and was inconsistent with other credible evidence, particularly regarding his living circumstances; and DHS had made unreasonable efforts to provide services to the family. The termination order was entered on August 2, 2011, and the parents timely appealed from this order.

■ In Gragg's no-merit brief, counsel first discusses the denial of her motion for directed verdict and the order terminating her parental rights. Both of these rulings involve the sufficiency of the evidence supporting the order of termination. A trial court's order terminating parental rights must be based upon findings proven by clear and convincing evidence. Ark.Code Ann. § 9–27–341(b)(3) (Supp.2011); *Dinkins v. Ark. Dep't of Human Servs.*, 344 Ark. 207, 40 S.W.3d 286 (2001). Clear and convincing evidence is defined as that degree of proof that will produce in the factfinder a firm conviction as to the allegation sought to be established. *Dinkins, supra.* On appeal, the appellate court will not reverse the trial court's ruling unless its findings are clearly erroneous. *Id.* A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id.* In determining whether a finding is clearly erroneous, an appellate court gives due deference to the opportunity of the trial court to judge the credibility of witnesses. *Id.*

Pursuant to Ark.Code Ann. § 9–27–341(b)(3), an order terminating parental rights shall be based on a finding by clear and convincing evidence that it is in the best interest of the juvenile, including consideration of the likelihood of adoption and the potential harm, specifically addressing the effect on the health and safety of the child, caused by continuing contact with the parent. The order terminating parental rights also must be based on a showing of clear and convincing evidence as to one or more of the grounds for termination listed in section 9–27–341(b)(3)(B). The ground relied on by the trial court in this case is set forth below:

(i)(*a*) That a juvenile has been adjudicated by the court to be dependent-neglected and has continued out of the home for twelve (12) months and, despite a meaningful effort by the department to rehabilitate the home and correct the conditions which caused removal, those conditions have not been remedied by the parent.

■ The children were removed from Gragg's custody in May 2010 and were adjudicated dependent-neglected due to inadequate supervision, environmental neglect, and Gragg's unfitness from alcohol abuse. Thereafter, Gragg made little progress in the case, and at the time of the termination hearing held thirteen months later, she was not in compliance with the majority of the case plan and court orders despite the offer of numerous services by DHS. She had only recently entered alcohol treatment, and she had no stable home, transportation, or sufficient income to support her children. Although her attitude and compliance with the case plan had improved in the month prior to the hearing, these last-minute efforts do not out-

weigh the remaining evidence supporting termination. Ark.Code Ann. § 9–27–341(a)(4)(A); *Camarillo–Cox v. Ark. Dep't of Human Servs.*, 360 Ark. 340, 201 S.W.3d 391 (2005). Thus, we agree with counsel that there could be no meritorious argument related to the ground for termination of Gragg's parental rights.

■ There was also ample evidence to support the trial court's finding that it was in the children's best interest for termination of Gragg's parental rights to occur. The court found from the testimony of the caseworker that they were adoptable, despite some behavioral and disability issues. The trial court also found that there would be potential emotional and physical harm if the children were returned to the home, based on Gragg's instability and alcohol addiction, and this finding is certainly supported by the evidence. *See Friend v. Ark. Dep't of Human Servs.*, 2009 Ark. App. 606, 344 S.W.3d 670 (A parent's lack of stable housing or employment, as well as an untreated substance-abuse problem are factors to consider in affirming termination order.). The trial court's decision to terminate Gragg's parental rights was not clearly erroneous, and there is no merit to an appeal on this basis.

■ Counsel next discusses the adverse evidentiary rulings made during the termination hearing that impacted Gragg. As counsel notes, there was a motion to strike part of Gragg's testimony that was not ruled upon by the trial court, and there were four objections made by appellants' counsel that were overruled: an objection based on relevance, an objection that a question had been asked and answered by Gragg, an objection to having Gragg identify her signature on a document that was later determined to be inadmissible by the trial court, and an objection as to speculation about Gragg's future income. We agree with counsel that none of these rul-

ings constituted reversible error. Counsel notes that there were additional objections that were sustained by the trial court but fails to recognize that at least four of these objections made by DHS's counsel were in fact adverse to Gragg. Thus, although they are abstracted, there is no discussion by counsel explaining why these rulings would not be a meritorious basis for appeal. Because we are required to review the entire record in a termination appeal, our supreme court has held that counsel's failure to abstract or discuss every adverse ruling does not prohibit us from granting counsel's motion to withdraw and affirming the termination order, where the rulings clearly did not constitute reversible error. *Lewis v. Ark. Dep't of Human Servs.*, 364 Ark. 243, 217 S.W.3d 788 (2005). The adverse rulings that are not discussed by counsel in this case are clearly not meritorious, and we therefore grant counsel's motion to withdraw and affirm the termination of Gragg's parental rights.

■ In his merit appeal, Lewis argues that there was insufficient evidence presented both to support the ground on which the trial court terminated his parental rights and to show that termination was in his children's best interest. First addressing the evidence supporting the ground for termination, Lewis contends that the sole ground relied on by the trial court did not apply to him because the children were in Gragg's custody when they were removed, and he was not responsible for the conditions that caused their removal.

This argument has merit. The children were initially removed after M.L. had been reported playing outside unattended and the condition of Gragg's apartment had been found deplorable. The uncontradicted evidence showed that Lewis had not been living with Gragg for some time, even though he remained in contact with her

and the children. The children were then adjudicated dependent-neglected on the basis of inadequate supervision, environmental neglect, and Gragg's alcohol abuse. None of the allegations in the petition for emergency custody related to Lewis. While the subsequent evidence showed that the children could not be placed with him due to his own issues with stable housing, employment, and income, as well as his drug use, these were not the initial reasons for the children's removal from the home.

In *K.C. v. Arkansas Department of Human Services*, 2010 Ark. App. 353, 374 S.W.3d 884, this court reversed an order of termination where the parent was not responsible for the conditions causing removal and where there were no other applicable grounds besides Ark.Code Ann. § 9–27–341(b)(3)(B)(i) (*a*) alleged in the petition for termination or argued at the hearing. We held that for us to conclude, upon our de novo review, that the evidence supported alternate grounds for termination not pled in the petition would violate the appellant's due-process rights. *Id.* However, in *Allen v. Arkansas Department of Human Services*, 2011 Ark. App. 288, 384 S.W.3d 7, where the parent also argued that he was not the cause of the children's removal, this court distinguished *K.C.* and affirmed the termination order because the petition for termination had in fact alleged an alternate ground under Ark.Code Ann. § 9–27–341(b)(3)(B)(vii) (*a*), the subsequent-factors ground.

Here, the only ground alleged in the termination petition and relied on by the trial court was not applicable to Lewis; therefore, we agree that the trial court's order of termination as to him was clearly erroneous, and we reverse and remand. As was stated in *Jones v. Arkansas Department of Human Services*, 2011 Ark. App. 632, at 5, 2011 WL 5110176, "the courts may not alter or disregard the language of a legislatively enacted ground for termination," and "[i]f the ground, as worded, does not fit the facts of the case, it should not be used." Because we are reversing based on the ground for termination, we do not address Lewis's argument as to the sufficiency of the evidence supporting the trial court's best-interest finding at this time.

Affirmed in part; motion to withdraw granted; reversed and remanded in part.

HART and BROWN, JJ., agree.