SLIP OPINION

Cite as 2015 Ark. App. 299

# ARKANSAS COURT OF APPEALS

DIVISION II
No. CV-14-1128

| | |
|---|---|
| DAMON RODGERS | Opinion Delivered MAY 6, 2015 |
| APPELLANT | |
| | APPEAL FROM THE FAULKNER |
| V. | COUNTY CIRCUIT COURT |
| | [NO. 23JV-13-217] |
| ARKANSAS DEPARTMENT OF | HONORABLE DAVID M. CLARK, |
| HUMAN SERVICES and MINOR | JUDGE |
| CHILD | |
| APPELLEES | AFFIRMED |

**DAVID M. GLOVER, Judge**

The Faulkner County Circuit Court granted the Arkansas Department of Human

Services' (DHS) petition to terminate the parental rights of appellant Damon Rodgers to his

son, T.W., born on October 29, 2011.[1] Rodgers appeals, arguing that there was insufficient

evidence to support the termination of his parental rights because the trial court erred in

finding that T.W. had been out of his home for twelve months prior to the termination of

his parental rights. We affirm the termination.

*Facts*

DHS initiated this action by filing a petition for ex parte emergency custody on April

25, 2013, based on the allegations in the affidavit of Magean Brents, a DHS employee.

According to Brents, Rodgers had called the DHS hotline concerned that T.W.'s health and

---

[1]T.W.'s mother, Tabitha Wilson, also had her parental rights terminated in this order,
but she is not a party to this appeal.

safety needs were not being met by his mother, Tabitha Wilson, who had custody of T.W.[2]

Rodgers had T.W. because he had been allowed visitation by Wilson, although it was not court ordered, and Wilson had not called to check on T.W. or to let him know when she would pick up T.W. Brents's affidavit stated that T.W. was in soiled clothing, smelled of cigarette smoke, and had a bruise on his forehead, a scrape on his lip, a burn mark on the top of his head, and other burn marks down his neck. Rodgers told Brents that T.W. had head lice; his clothes were too small and his shoes had dog feces on them; Wilson's home was filthy and unliveable; Wilson smoked around T.W., even though he had breathing problems and was taking breathing treatments; Wilson smoked marijuana and used methamphetamine; Wilson only bathed T.W. once a week; and Wilson did not have diapers or formula for T.W. By order entered on April 25, 2013, the trial court granted DHS's petition for emergency custody; that order also held that the parents had a continuing duty of support to T.W., although no specific amount of support was ordered.

By order entered on June 5, 2013, T.W. was adjudicated dependent–neglected (based on the trial court's acceptance of the parties' stipulation to a finding of dependency–neglect based on environmental neglect). In that order, Rodgers was directed to cooperate with DHS; keep DHS informed of his residence and place/status of his employment and any changes; take medications as prescribed; refrain from using illegal drugs and alcohol; submit

---

[2]Rodgers is referred to throughout the case as T.W.'s father/putative father. Rodgers's testimony at the termination hearing was that he had been determined through paternity testing to be T.W.'s father. Although no paternity-test results were introduced into evidence, it is not disputed that Rodgers was T.W.'s father.

to random drug screens; complete parenting classes and demonstrate improved parenting skills; obtain and maintain stable housing and employment; maintain a clean, safe home; and demonstrate an ability to protect and keep T.W. safe. The adjudication order further specifically found that Rodgers had a duty to pay child support, instructing Rodgers to pay $50 per month in support.

By review order filed on August 27, 2013, the trial court found Rodgers had partially complied with the case plan and court orders, having attended some visitations and some parenting classes; having begun to attend counseling; and having had clean drug screens. However, by a subsequent review order filed in December 2013, the trial court found that Rodgers had failed to comply with the case plan and court orders and further found that visitation was appropriate for Wilson, but not Rodgers. In the April 2014 permanency-planning order, visitation for Rodgers was resumed. The trial court found that Rodgers had partially complied with the case plan and court orders by having clean drug screens and having suitable housing, but he had not completed parenting classes and had stopped attending counseling. The trial court, therefore, found that adoption was an appropriate goal.

On May 8, 2014, DHS filed a petition to terminate Rodgers's and Wilson's parental rights, alleging as grounds as to Rodgers that (1) T.W. was adjudicated dependent-neglected and had continued to be out of the custody of the parent for twelve (12) months and, despite a meaningful effort by DHS to rehabilitate the parent and correct the conditions that caused removal, those conditions had not been remedied by the parent; and (2) T.W. had lived outside the home of the parent for a period of twelve (12) months and the parent had willfully

failed to provide significant material support in accordance with the parent's means or to maintain meaningful contact with T.W.

At the termination hearing, Rodgers admitted that the case was initiated by his call to the DHS hotline. He explained that he had never had custody of T.W. but said that there was a finding in August 2012 that he was T.W.'s legal father. Rodgers agreed he had been ordered to pay monthly child support of $50 but was not current on his obligation—in fact, he admitted that he had never paid child support for T.W. He said that he was going to pay child support but he had recently had a car wreck and incurred some medical bills; he stated he was going to begin paying his child support the next month because he had paid off his medical bills. Rodgers testified that he drew disability of $721 per month, and his stepbrother and his stepbrother's fiancee lived with him. He explained that he was able to pay his bills because he split the bills with his two roommates and he received food stamps. Rodgers admitted his disability check had increased $80 per month, but instead of paying child support, he claimed to have used the extra money to obtain a house and things he needed for T.W. Rodgers said that he visited T.W. when he could, but that he had not visited with T.W. in August and had visited only once in July. Rodgers also admitted that he had not sent T.W. any cards or gifts while T.W. had been in foster care. Rodgers asserted that he had completed both parenting classes and counseling but did not have proof of completion for either. He opined that he should be given custody of T.W., stating that he had everything that T.W. needed, although he brought no proof to the termination hearing.

Beth O'Nash, the family-service worker assigned to the case, testified she had never refused Rodgers services; she had not received proof that Rodgers had completed parenting classes (just a certificate of attendance) or counseling; Rodgers had not given her any gifts or cards to give to T.W.; Rodgers had no trial placements in his home to her knowledge; and while Rodgers had one supervised visit with T.W. since O'Nash had been the caseworker and had been attentive to T.W., he ended the visit about forty-five minutes early. O'Nash admitted that T.W. had been living out of state from February to May 2014, and that there had been three or four visits since May 2014 that were missed due to DHS. O'Nash said that Rodgers did not make up any of the visits he missed due to illness. O'Nash believed that it would be harmful for T.W. to go home with Rodgers because there was no indication that Rodgers would be able to care for T.W.

Monica Spencer, an adoption specialist, testified that the likelihood of T.W. being adopted was very high. She explained that, while there were no prospective adoptive families for T.W. because he was not yet available for adoption, T.W. was a young child with no major medical issues and that there should be families interested in adopting him.

After the hearing on DHS's petition, the trial court terminated Rodgers's parental rights on both bases. The trial court found, over Rodgers's objection, that as to the first basis (removal from custody for twelve months and failure to remedy reason for removal), that while Rodgers was not the legal custodian at the time of T.W.'s removal, DHS actually took T.W. from Rodgers, not Wilson, and that Rodgers was unable at that time to take care of T.W., which was the reason T.W. had to be placed in DHS custody. Rodgers's counsel

SLIP OPINION

stipulated that there was a prima facie argument to be made for failure to support. The trial

court stated that, due to the out-of-state placement of T.W. for several months, it would not

find that Rodgers had failed to maintain meaningful contact with T.W. However, the trial

court found that, by his own admission, Rodgers had paid no support at all for T.W. The

trial court further found that it was in T.W.'s best interest to terminate Rodgers's parental

rights.

*Standard of Review*

In *Tillman v. Arkansas Department of Human Services*, 2015 Ark. App. 119, at 6–7, our

court set forth our standard of review for termination-of-parental-rights cases:

> Termination-of-parental-rights cases are reviewed de novo. *Allen v. Ark. Dep't of Human Servs.*, 2011 Ark. App. 288, 384 S.W.3d 7. Grounds for termination of parental rights must be proved by clear and convincing evidence, which is that degree of proof that will produce in the finder of fact a firm conviction of the allegation sought to be established. *Id*. The appellate inquiry is whether the trial court's finding that the disputed fact was proved by clear and convincing evidence is clearly erroneous. *Id*. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id*. In resolving the clearly erroneous question, we give due regard to the opportunity of the trial court to judge the credibility of witnesses. *Id*. Termination of parental rights is an extreme remedy and in derogation of a parent's natural rights; however, parental rights will not be enforced to the detriment or destruction of the health and well-being of the child. *Id*.
>
> In order to terminate parental rights, a trial court must find by clear and convincing evidence that termination is in the best interest of the juvenile, taking into consideration (1) the likelihood that the juvenile will be adopted if the termination petition is granted; and (2) the potential harm, specifically addressing the effect on the health and safety of the child, caused by returning the child to the custody of the parent. Ark. Code Ann. § 9-27-341(b)(3)(A)(i) & (ii) (Supp. 2013). The trial court must also find by clear and convincing evidence that one or more statutory grounds for termination exists. Ark. Code Ann. § 9-27-341(b)(3)(B). However, proof of only one statutory ground is sufficient to terminate parental rights. *Allen, supra*.

*Argument*

Rodgers makes no argument on appeal that it was not in T.W.'s best interest for his parental rights to be terminated. Rather, he focuses on the grounds for termination and argues that the trial court erred in terminating his parental rights on the basis that T.W. had lived out of the home for twelve months because he never had legal custody of T.W.—Wilson always had custody. Rodgers is correct that the basis for parental-rights termination found in Arkansas Code Annotated section 9-27-341(b)(3)(B)(i)(*a*)—that a juvenile has been adjudicated by the court to be dependent-neglected and has continued to be out of the custody of the parent for twelve (12) months and, despite a meaningful effort by the department to rehabilitate the parent and correct the conditions that caused removal, those conditions have not been remedied by the parent—is not applicable to him. In *Lewis v. Arkansas Department of Human Services*, 2012 Ark. App. 154, 391 S.W.3d 695, the appellant was not living with the children when they were removed from their mother's custody because they were left unsupervised in an environmentally unsafe apartment, and the sole ground for termination of parental rights was the one set forth above. In *Lewis*, this court reversed the termination of Lewis's parental rights, holding, "None of the allegations in the petition for emergency custody related to Lewis. While the subsequent evidence showed that the children could not be placed with him due to his own issues with stable housing, employment, and income, as well as his drug use, these were not the initial reasons for the children's removal from the home." 2012 Ark. App. 154, at 14, 391 S.W.3d at 704.

This is the same situation we have with Rodgers—none of the reasons that T.W. was taken into emergency custody related to Rodgers—they related to Wilson. While it was Rodgers that brought these issues to the attention of DHS, and while he was unable to care for T.W. at that time, that does not negate the fact that Wilson had legal custody of T.W. at the time he was taken into custody, a fact the trial court recognized in its ex parte order for emergency custody when it found that immediate removal from Wilson's custody was in T.W.'s best interest and was necessary to protect his health and safety because he had been subjected to physical abuse, neglect, and parental unfitness by Wilson.

However, the trial court also found a second ground to support the termination of Rodgers's parental rights—Arkansas Code Annotated section 9-27-341(b)(3)(B)(ii)(*a*), which provides, "The juvenile has lived outside the home of the parent for a period of twelve (12) months, and the parent has willfully failed to provide significant material support in accordance with the parent's means or to maintain meaningful contact with the juvenile." It is not necessary that the twelve-month period immediately precede the filing of the termination petition or be for twelve consecutive months. Ark. Code Ann. § 9-27-341(b)(3)(B)(ii)(*d*). The trial court did not find that Rodgers had failed to maintain meaningful contact with T.W., so the only portion of this ground that is applicable is the failure to support. "Material support" can be either financial contributions or food, shelter, clothing, or other necessities that have been ordered to be provided by a court of competent jurisdiction. Ark. Code Ann. § 9-27-341(b)(3)(B)(ii)(*c*).

To the extent that Rodgers's "twelve-month" argument can be applied to this ground for termination, it must fail. This ground merely provides that the juvenile live outside the home of the parent for twelve months; it does not require that the child be removed from the custody of the parent as required by the ground found in subsection 9-27-341(b)(3)(B)(i). In *Banks v. Arkansas Department of Human Services*, 2010 Ark. App. 53, our court affirmed the termination of parental rights of a father on the ground that he failed to pay court-ordered support, despite the apparent ability to do so; in that case, as in the present case, the child had never lived with the father. A parent has a legal duty to support his child, regardless of the existence of a support order. *Lineham v. Hyde*, 2015 Ark. App. 38, 454 S.W.3d 257. Here, Rodgers was ordered to pay $50 per month in child support in the adjudication order. Not only did he fail to make any payments of child support pursuant to this order (although he was able to pay several medical bills during that time), Rodgers, by his own admission, has never paid any child support for T.W. This alternative failure-to-support basis provides a viable ground for termination, and the trial court's decision to terminate on this basis is not clearly erroneous.

Affirmed.

KINARD and HIXSON, JJ., agree.

*Travis Ragland*, for appellant.

*Tabitha B. McNulty*, County Legal Operations, for appellee.

*Chrestmas Group, PLLC*, by: *Keith L. Chrestman*, attorney ad litem for minor child.