Cite as 2021 Ark. App. 6

# ARKANSAS COURT OF APPEALS

DIVISION III

**No.** CV–20–511

|  |  |
|---|---|
| BRAD HONEYCUTT<br><br>APPELLANT<br><br>V.<br><br>ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILDREN<br><br>APPELLEES | **Opinion Delivered:** January 13, 2021<br><br>APPEAL FROM THE WASHINGTON COUNTY CIRCUIT COURT [NO. 72JV-19-19]<br><br>HONORABLE STACEY ZIMMERMAN, JUDGE<br><br>AFFIRMED |

## BART F. VIRDEN, Judge

Brad Honeycutt appeals the Washington County Circuit Court's decision to terminate his parental rights to YH (born 2/18/16), and SH (born 4/25/17), challenging both the adoptability and potential harm prongs of the court's best-interest finding. We affirm.

### I. *Relevant History*

The facts relevant to this appeal are summarized here. On January 9, 2019, the Arkansas Department of Human Services ("Department") filed a petition for emergency custody and dependency-neglect regarding YH and SH.[1] In the petition Honeycutt was

---

[1]Two of YH and SH's older half siblings, DP (born 3/16/09) and JP (born 6/19/11), also the subjects of the emergency petition, are not Honeycutt's children and are not involved in this appeal. Amber Lewis, the mother of all four children, is not involved in this appeal.

identified as the putative parent of YH and SH. In the affidavit attached to the petition, the Department stated that emergency removal from the custody of the mother, Amber Lewis, was necessary to protect the children from immediate harm for the following reasons.[2] On January 6, police and ?a Department caseworker arrived at the home pursuant to a hotline call and found YH and SH half-naked in the house with the front door open. The older children explained that no one was watching them. When Lewis returned from her errands, she explained that she had left the children with Charles Hammersly; however, Hammersly had been in the shed in the backyard when police and the family service worker arrived at the home. Lewis submitted to an in-home drug test and tested positive for methamphetamine and amphetamines. The family service worker noted that the house was cluttered, boxes were stacked up in the hallway in an unsafe condition, and the house was filthy. There was no one to take custody of the children. The Department filed the petition for removal and stated that the basis for the petition was environmental neglect and inadequate supervision.

The circuit court entered the ex parte emergency order finding probable cause that the children were dependent-neglected, and removal was necessary to protect their health and safety. In the February 21 adjudication and disposition order, the circuit court found that Honeycutt was the father of YH and SH and noted that Honeycutt attended the hearing by phone. The parents were ordered to obtain and maintain stable housing and demonstrate the ability to keep the children safe. In the April 12 adjudication order, the circuit court

---

[2]The Department opened a case on the family since SH's birth in 2017 pursuant to Garrett's law.

found that Honeycutt had not contributed to the dependency-neglect of the children, but he was not a fit parent for custody or visitation because he was incarcerated.

On September 30, the court entered a review order finding that the children must remain in the Department's custody and could not be returned to Lewis's care. The court found that Lewis had not complied with the case plan, completed any of the orders or availed herself of services. The court found that Honeycutt had made no progress toward reunification or complied with the orders of the court, and he was not participating in the case plan because he was currently incarcerated. The court noted that there was no extrinsic evidence of Honeycutt's paternity of YH and SH, and it set aside its previous finding that he is the "legal father." The court ordered the Department to take the necessary steps to prove Honeycutt's paternity.

On November 22, the court entered the permanency-planning order. As to Honeycutt, the circuit court found that he had not made measurable progress toward reunification and had not complied with the court's orders because he was incarcerated "and will be in prison until 2020." The court ordered the Department to conduct an expedited home study for Susan Prince, Honeycutt's mother, who lives in Oklahoma. The court found that Prince "wishes to be considered as a placement; however, paternity has not been established and Susan Prince's home is not appropriate for children and she is looking for a new trailer which would be appropriate for the children."

The Department filed a petition to terminate Honeycutt's parental rights asserting that three statutory grounds supported termination: (1) other factors or issues arose subsequent to the filing of the original petition that demonstrate that placement of the

3

children with the parent is contrary to the children's health, safety, or welfare and that despite the offer of appropriate family services, the parent has manifested the incapacity or indifference to remedy the subsequent issues or factors or rehabilitate the circumstances that prevent placement in his custody; (2) the children had been out of the custody of the noncustodial parent for twelve months, and despite meaningful effort to rehabilitate the parent and correct the conditions, he had not remedied the conditions; and (3) the parent is incarcerated in a criminal proceeding for a period of time that would constitute a substantial period of the children's lives.

The court held the termination hearing on May 14, 2020, and the relevant testimony is summarized here. Courtney Jordan, the family service worker, opined that neither YH nor SH has any medical needs that would prevent adoption, and that YH is "a very sweet girl" who "keeps you laughing." Jordan testified that SH is affectionate and "very sweet" and loves to show people his toys. Jordan explained that Honeycutt had not participated in the case plan, and he was incarcerated. She stated that she had "maybe two or three phone calls from him, but not weekly contact at all." She opined that Honeycutt had not demonstrated the ability to parent the children, and the children "do not remember him." She testified that Honeycutt participated in workshops in prison, including anger management and "Putting the Pieces Back Together," which covers employment, housing, transportation and legal aid; however, he did not complete any of the referrals that had been submitted for him. Jordan acknowledged that Honeycutt had written her weekly letters describing the classes he had completed. She stated that Honeycutt was supposed to be released from prison in February or March, but his release had been "pushed off" till June.

Jordan explained that Prince was not a viable placement for the children because of her "extensive" history with child protective services.

Honeycutt testified that he was currently incarcerated and that he had been incarcerated since before SH was born and YH was ten months old. He explained that he had been sober for a year and a half and that he planned to live with his mother in her new home when he was released. He explained that his mother had prior run-ins with the Department, the last time for having a house that wasn't livable; however, she had just purchased a brand-new house.

Susan Prince testified that she had purchased a new mobile home with three bedrooms and two bathrooms. Prince stated that she had never met SH and that she knew YH when she was a baby, but she had not seen YH since Lewis moved away. She testified that in 2016, her daughter and her daughter's children were living with her, but the children were removed from her home. She explained that "when Brad was younger DHS did come to my house a couple of times. It was reported that I was supposed to have done something. When they got there, they found out I didn't do it."

YH and SH's foster parent testified that YH suffers from anxiety, has nightmares, and wakes up frequently. When YH cannot sleep she has behavior problems the next day, but when she sleeps well, her behavior is much better, and YH "can be a delightful child." He testified that SH is doing very well and "blossoming." The foster father explained that due to COVID-19 the family was quarantined together without daycare. He stated that YH needs a lot of one-on-one attention and acts out if she does not get it. He confirmed that he and his wife requested that the children be moved to a preadoptive home, explaining

that they were not a foster-to-adopt home, and he believed that the children needed permanency for them to continue to improve. The foster parents explained that the family had been quarantined together since March, they were tired, and that

> [w]e, kind of, have gotten to a difficult point—and tired—to continue to provide the level of care that they need. I mean, working with the therapist has helped quite a bit and continues to help us help them work through all the trauma that they've suffered. And it's really important that wherever they go next in their life is a permanent solution, and that everyone feels very confident that that is a permanent solution so that they, you know, have the best opportunity to continue to grow and recover from all the trauma that they've suffered.

The foster parents stated that they wanted to provide care for the children until a pre-adoptive home was found.

The court entered the termination order on June 12. The court found that Honeycutt is the father of YH and SH based on the completed paternity test. The court terminated Honeycutt's parental rights, finding that each of the grounds alleged by the Department was supported by the evidence. The court stated that it considered the testimony that the children are very adoptable with no special needs that would prevent them from being adopted. Specifically, the court cited the testimony that YH is very sweet and smart and is seeing a trauma-based therapist and that SH is very sweet and loves to show people his toys. The court found that the Department was not required to identify an adoptive home before termination and that "the court has explored the issue of adoptability today, and specifically finds that each of the juveniles are extremely adoptable." As to potential harm, the court found that Honeycutt was incarcerated, had no job or residence, and had not demonstrated that he could safely care for the children who had no bond with him. The court also followed up on the potential placement with Prince, finding that

6

Prince's home was not suitable, and she was denied placement because of her child-maltreatment history. Moreover, the court noted that Prince had not seen YH since she was eleven months old. This appeal followed.

## II. *Legal Framework*

We review termination-of-parental-rights cases de novo. *Lively v. Ark. Dep't of Human Servs.*, 2015 Ark. App. 131, 456 S.W.3d 383. It is the Department's burden to prove by clear and convincing evidence that it is in a child's best interest to terminate parental rights as well as the existence of at least one statutory ground for termination. *Id.* On appeal, the inquiry is whether the circuit court's finding that the disputed fact was proved by clear and convincing evidence is clearly erroneous. *Id.* A finding is clearly erroneous when, although there is evidence to support it, the appellate court, on the entire evidence, is left with a definite and firm conviction that a mistake has been made. *Id.* We give a high degree of deference to the circuit court because it is in a far superior position to observe the parties before it and judge the credibility of the witnesses. *Id.*

The best-interest analysis includes consideration of the likelihood that the children will be adopted and of the potential harm caused by returning custody of the children to the parent. Ark. Code Ann. § 9-27-341(b)(3)(A) (Supp. 2019). However, adoptability and potential harm are merely factors to be considered—they are not elements of the cause of action and need not be established by clear and convincing evidence. *See Chaffin v. Ark. Dep't of Human Servs.*, 2015 Ark. App. 522, 471 S.W.3d 251. Rather, after considering all the factors, the circuit court must find by clear and convincing evidence that termination of parental rights is in the best interest of the children. *Id.*

III. *Discussion*

A. Potential Harm

Honeycutt appeals both the potential-harm and the adoptability prongs of the circuit court's best-interest finding.[3] First, Honeycutt argues that the circuit court erred because the court had "absolutely no evidence on which to make a finding that there was a real risk of harm to YH and SH if the case continued for another few months so that [he] could be released and show his stability as a placement for his children." Honeycutt explains that YH and SH would be in foster care for "at a minimum, another six months" because of the amount of time the adoption process typically takes. By the end of six months, Honeycutt asserts that he would be released from incarceration, have completed the case plan and have a home ready for the children. We do not find Honeycutt's argument persuasive. "Stability and permanence for children are the objectives of the TPR procedure and living in continued uncertainty is itself potentially harmful to the children." *See Bean v. Ark. Dep't of Human Servs.*, 2017 Ark. App. 77, at 30, 513 S.W.3d 859, 877. The circuit court is only required to consider potential harm to a child's health and safety that might come from continued contact with the parents; there is no requirement to find that actual harm would result or to identify the potential harm. *Pine v. Ark. Dep't of Human Servs.*, 2010 Ark. App. 781, 379 S.W.3d 703. The potential-harm analysis is to be conducted in broad terms. *Id.* Here, Honeycutt's assertion that he can be ready to parent YH and SH in the same amount of time that the adoption process takes is contingent on several events taking place first: his

---

[3]Honeycutt does not appeal the statutory basis for the termination of his parental rights.

release from prison, completion of the case plan, and obtaining a safe home for the children. This kind of wait-and-see approach is the definition of the instability that the termination statute is intended to protect children from. *See Hoffman v. Ark. Dep't of Human Servs.*, 2010 Ark. App. 856, 380 S.W.3d 454.

Moreover, Honeycutt did not appeal the statutory grounds for the termination of his parental rights; thus, he does not challenge that he is serving a ten-year sentence that began in 2016. It is the sentence, as opposed to a potential release date, that controls in determining whether this statutory ground has been satisfied. *See Fields v. Ark. Dep't of Human Servs.*, 104 Ark. App. 37, 289 S.W.3d 134 (2008). The court considered evidence that Honeycutt would not be released until the children were around nine and ten years old. Also, there was testimony that Honeycutt's early-release date had been pushed back to June rather than February or March as had previously been planned. The circuit court determined that the need for permanency outweighed Honeycutt's request for more time, and we are not left with a definite and firm conviction that the circuit court erred by finding that the children were subject to potential harm if returned to Honeycutt's custody.

## B. Adoptability

Second, Honeycutt contends that the testimony supporting the court's finding that the children are adoptable is scant and lacks credibility. Specifically, Honeycutt asserts that the court's adoptability finding is critically undermined because the Department did not perform the usual data-matching search to determine how many potential families matched with the children. Honeycutt further argues that the foster parents' testimony that they requested that YH and SH be moved to another family conflicts with the testimony that the

9

children are adoptable. He also asserts that the circuit court failed to properly consider placement with the children's half siblings. Honeycutt's arguments are not well taken.

Arkansas law does not require that data-matching evidence be presented for the court to find that children are adoptable. A caseworker's testimony that a child is adoptable is sufficient to support an adoptability finding. *Caldwell v. Ark. Dep't of Human Servs.*, 2016 Ark. App. 144, 484 S.W.3d 719. At the termination hearing, the caseworker testified that the children are "very sweet" and that neither child had any medical issues that would prevent adoption. The foster father testified YH has made progress with her anxiety issues. He stated that SH is "blossoming" and is well adjusted and that both children are adoptable. Moreover, the foster parents testified that they are not a preadoptive family, and they requested that the children be transferred to a preadoptive family because it was in the children's best interest to have permanency. The foster parents explained that YH has anxiety issues, does not always sleep well and needs a great deal of attention. The foster father stated that YH does well when she receives the attention she needs and when she has enough sleep. The foster parents explained that due to the pandemic, they had been quarantining together without daycare services, and they were "tired." The court did not interpret the foster parents' frank statement about the difficulties of foster parenting during a pandemic and their concerns about the children's needs for permanency as negating the testimony that the children are adoptable, and our review of the record in this case convinces us the circuit court did not clearly err in finding that the children are adoptable.

Honeycutt's final argument regarding the circuit court's adoptability finding—that the circuit court failed to consider placing YH and SH with their half siblings—is not

preserved for appeal. Honeycutt did not propound this argument to the circuit court. Arguments made for the first time on appeal are not properly before the appeals court. *Myers v. Ark. Dep't of Human Servs.*, 91 Ark. App. 53, 208 S.W.3d 241 (2005).

C. Least Restrictive Disposition

Honeycutt contends that the juvenile code requires that the circuit court give preference to the least restrictive disposition available, and here, termination was unnecessary because he could be ready to give the children a home in the same amount of time, or less, than it would take to complete the adoption process.

Arkansas Code Annotated section 9-27-329(d)(Supp. 2019) provides that in considering the disposition alternatives, the circuit court "shall give preference to the least restrictive disposition *consistent with the best interests* [*of the child*]." (Emphasis added.) In each of the cases Honeycutt cites for support, the children were placed with family members or the court was considering family placement. *See Lively v. Ark. Dep't of Human Servs.*, 2015 Ark. App. 131, 456 S.W.3d 383; *Ivers v. Ark. Dep't of Human Servs.*, 98 Ark. App. 57, 68, 250 S.W.3d 279, 286 (2007). By contrast, YH and SH had been in foster care for sixteen months at the time of the termination hearing, and the court found that it was in the children's best interest to work toward permanency rather than allow more time for Honeycutt to begin completing the case plan. As we held above, the circuit court did not err in finding that the children's need for permanency outweighed Honeycutt's request for time to complete the case plan; thus, the circuit court chose the least restrictive plan consistent with the best interest of the children. We affirm.

Affirmed.

KLAPPENBACH and WHITEAKER, JJ., agree.

*Jennifer Oyler Olson*, Arkansas Commission for Parent Counsel, for appellant.

*Andrew Firth*, Office of Chief Counsel, for appellee.

*Kimberly Boling Bibb*, attorney ad litem for minor children.