Cite as 2021 Ark. App. 454

# ARKANSAS COURT OF APPEALS
DIVISION IV
No. CV-21-329

| | |
|---|---|
| ASHLEY ROCHA AND CHRISTOPHER ROCHA<br><br>APPELLANTS<br><br>V.<br><br>ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILDREN<br><br>APPELLEES | OPINION DELIVERED NOVEMBER 17, 2021<br><br>APPEAL FROM THE GARLAND COUNTY CIRCUIT COURT [NO. 26JV-19-192]<br><br>HONORABLE LYNN WILLIAMS, JUDGE<br><br>AFFIRMED; MOTION TO WITHDRAW GRANTED |

**ROBERT J. GLADWIN, Judge**

In this combined appeal of a termination-of-parental-rights order in the Garland County Circuit Court, appellant Ashley Rocha argues that appellee Arkansas Department of Human Services (DHS) failed to present sufficient evidence to support the circuit court's best-interest finding. Counsel for appellant Christopher Rocha filed a separate no-merit brief and motion to withdraw pursuant to Arkansas Supreme Court Rule 6-9(j) (2021). The clerk of this court delivered to Christopher a copy of counsel's brief and motion to withdraw and advised him of his right to file pro se points for reversal; however, no pro se points were filed. We affirm the termination of parental rights as to both parents and grant counsel's motion to withdraw.

## I. *Facts*

On August 5, 2019, DHS filed a petition for dependency-neglect, and an ex parte order granting DHS custody was filed. In the petition, DHS alleged that Ashley and Christopher's four children, MR (born June 18, 2015), DR (born May 12, 2017), ER (born August 15, 2018), and JR (born July 17, 2019), were dependent-neglected and at substantial risk of serious harm as a result of neglect and parental unfitness.

The attached affidavit states that the family had concluded a foster-care case with DHS on December 7, 2018. On August 1, 2019, a new referral indicated that Ashley tested positive for methamphetamine during her pregnancy with JR and that JR had tested positive for amphetamines/methamphetamine when he was born. As a result of the referral, DHS conducted a home assessment after notifying law enforcement because of "continued domestic violence with the family."

The affidavit alleges that when DHS arrived, Ashley was in her van "attempting to leave," and Christopher was "hiding in the bathroom closet and was not present with the children." At the time, Christopher was subject to a February 1, 2019 no-contact order with Ashley, and he had been charged with third-degree battery for beating Ashley with a skateboard. The affiant found JR in a toddler seat with a blanket wrapped in front of his face. Both parents expressed anger, Ashley denied any drug use, and Ashley refused to provide DHS with the children's birth certificates and Social Security cards. Further, the home's kitchen was full of food left on the counters and the floor, the living room was cluttered, the parents' bedroom had clothes and trash on the floor, and the boys' bedroom and bathroom needed moderate cleaning and had clothes and trash on the floors. The

children were taken into DHS custody, and the parents tested positive for K2 at a screening conducted at the DHS office. Both parents denied knowledge of K2 and denied smoking it. Christopher became irate and was asked to leave the DHS office.

At the August 7 probable-cause hearing, the parents stipulated that the emergency conditions continued. The circuit court ordered that the children remain in DHS custody as the least restrictive alternative.

On September 4, an adjudication hearing was held, and the parents stipulated that the children were dependent-neglected due to neglect and parental unfitness. The adjudication order reflects that the children were subject to environmental neglect, that Ashley and JR tested positive for methamphetamine at the time of JR's birth, and that the children had been exposed to domestic violence in the home. The goal of the case was reunification with a concurrent goal of "permanent guardianship/permanent custodial placement/adoption." The parents were ordered to follow the court's orders and the DHS case plan; view "The Clock is Ticking" video; cooperate with DHS caseworkers and the CASA volunteer; demonstrate the ability to care for the children and provide for their health, safety, and welfare; remain clean and sober; submit to random drugs screens and test clean on all random drug screens; submit to a drug-and-alcohol assessment and follow the recommendations; complete parenting classes; submit to individual counseling; submit to a psychological evaluation and follow the recommendations; obtain and maintain stable employment and housing; attend and complete anger management; notify the DHS caseworker forty-eight hours in advance of a need for transportation assistance; and maintain a clean, safe living environment for the children.

A review hearing was held on December 11, and the court ordered that the children remain in DHS custody due to parental unfitness. The court found that DHS had made reasonable efforts to provide family services and had complied with the case plan and court orders. The court found that the "siblings are not placed together," that DHS had made reasonable efforts to reunite them, and that DHS presented evidence that there were no available relative placements. The parents were found to have minimally complied. Ashley was unemployed, Christopher claimed that he was employed but provided no proof to his caseworker, and domestic violence continued between the parents. The parents had complied with visitation and participated in parenting classes. They had tested clean "on a few drug screens" with other samples returning invalid for no temperature, and they "recently" refused to provide a sample for screening. "The parents have not demonstrated progress toward the goal of the case plan." They were ordered to complete their psychological evaluations and drug-and-alcohol assessments.

A review hearing was held on March 4, 2020, and the goal of the case remained unchanged. The court found that the parents had minimally complied. Ashley remained unemployed, and Christopher reported employment but did not show proof to his caseworker. Neither parent appeared for their psychological evaluation or drug-and-alcohol assessment. Ashley tested positive for methamphetamine on January 9, 2020, and on February 6, Christopher admitted that he and Ashley were still using methamphetamine and had been falsifying drug screens. The court found that domestic violence between the parents continued. During transport to a visitation, the parents became so physically violent with each other that their caseworker had to pull the car to the side of the road. The parents

4

continued the altercation while outside the car, and the caseworker had to request help from the police. The court relieved DHS of any obligation to transport the parents to services. The parents were again ordered to complete their psychological evaluations and drug-and-alcohol assessments.

On July 15, an agreed permanency-planning order changed the goal of the case to adoption, and DHS was authorized to file a petition for termination of parental rights. The court found that Ashley reported being employed without providing proof to her caseworker and that she had "again acquired criminal charges." The father "again finds himself incarcerated." The parents completed their psychological evaluations, but Ashley had attended only two counseling sessions. Neither had completed their drug-and-alcohol assessment, anger-management class, or domestic-violence class; neither had achieved stable housing or sobriety; and neither had sought drug treatment or followed the recommendations of their psychological evaluations.

On August 21, Ashley moved for change of foster parents. She alleged that she had been denied two visitations for frivolous reasons. She claimed that "after one investigation was closed with an untrue finding, another allegation was made to open up a new investigation on the younger two children who are only one and two years old and would be unable to make such allegations." She alleged that the foster parents caused the allegations to be made because they want to adopt the children.

On September 1, DHS filed a petition for termination of parental rights alleging four statutory grounds: (1) failure to remedy (Ark. Code Ann. § 9-27-341(b)(3)(B)(i)*(a)*) (Supp. 2021); (2) failure to support (Ark. Code Ann. § 9-27-341(b)(3)(B)(ii)*(a)*); (3) subsequent

factors (Ark. Code Ann. § 9-27-341(b)(3)(B)(vii)); and (4) aggravated circumstances (Ark. Code Ann. § 9-27-341(b)(3)(B)(ix)*(a)(3)(A)*).

Between October 22, 2020, and February 25, 2021, Ashley was granted four continuances. At the March 31 termination-of-parental-rights hearing, Sara Washburn testified that she is the assigned DHS caseworker, and her report was admitted in evidence. She said that Christopher had been in jail since she had been assigned and that she had worked with Ashley during the few months before the hearing. She said that Ashley had completed a thirty-day treatment program with Harbor House and that after the program, she returned to Hot Springs and had visitation with the children. She said that MR's therapist recommended that MR not participate in visitation over the last few weeks before the hearing and that Ashley had been "overall fairly cooperative." She explained that Ashley was drug screened by another caseworker on March 19 and tested positive for methamphetamine, amphetamines, and THC. Ashley challenged the drug screen, and the positive test was confirmed at the lab. She said that Ashley had two negative drug screens since then, and on the Monday before the hearing, she asked Ashley to come into the office for a drug screen. Ashley did not have transportation, and Washburn gave her time to walk to the DHS office, but Ashley did not. She said that Ashley claims to be employed but has not provided any paystubs and that Ashley lives with her father, but he has not been present during any home visits.

During Washburn's cross-examination by Ashley's counsel, exhibits were admitted in evidence reflecting that Ashley had completed a program at Gateway Recovery Center in February 2021; an eight-hour Nurturing Parenting Program; fifteen hours of anger-

6

management classes; and a parenting course. Proof was submitted of Ashley's employment with SG 360, which began on March 4, 2021. Washburn said that Ashley had completed most of her services, that Ashley's father's house was appropriate, and that she would not object to increased visitation.

During cross-examination by Christopher's counsel, Washburn said that Christopher had been offered the same services as Ashley and that she did not ask those providers if they would offer the services to Christopher while he was in jail. She said she had been on the case for four months, that she did not contact Christopher regarding services while he was in jail, and that he is expected to be released from jail in April 2021.

On redirect, Washburn testified that the case began in 2019, and the children were taken into DHS custody due to domestic violence and drug use by the parents. Neither of those issues had been resolved, and the children had been in DHS custody for eighteen months. She said that this is the second foster-care stay for the oldest two children.

Jennifer Gianossa testified that she is Washburn's coworker and that she administered Ashley's drug screen on March 19. Kathleen McDaniel, adoption supervisor for DHS, testified that there are five potential adoptive families that would be willing to adopt the children as a group. She said that she expected to find a permanent family for the children and that the agency would consider vetting any family member interested in adopting.

Brock Baker, DHS caseworker supervisor, testified that he was the removing family social worker both times the children were placed in DHS care. He said that DR had been born with methamphetamine in his system and that the oldest two children, MR and DR, were in foster care from 2017 to 2018, for over a year. The children were returned to their

parents on November 28, 2018. On August 1, 2019, all four children went into foster care when JR was born with methamphetamine in his system. He said that services were offered to the family during both cases and that DHS does not believe Ashley is sober because she had been admitted to two different rehabs and she was either removed or she left before her successful entry into Harbor House. He said that Christopher and Ashley had not provided any financial support to the children during their time in DHS custody, that Ashley is recently employed and lives with her father, and that Christopher is unemployed and is incarcerated. He said that there had been five no-contact orders between Ashley and Christopher over the past three years and that at least one child was conceived during the active period of a no-contact order. He stated that he would be concerned for Ashley and the children if Christopher were allowed to be around them because of the domestic abuse.

Steven Sexton testified that he is Ashley's father and that he has given Ashley permission to live in his house with her children. On cross-examination, he said that when Christopher was not incarcerated, he offered his house for Ashley and the children, and she had stayed with him a couple of times. He said that she stayed with him because she did not have a job or "was losing" her home and that it was not necessarily because Christopher was violent toward her. He said that Ashley and Christopher had histories of unemployment or "not having housing." He could not remember the most recent incident that caused Christopher to be arrested and incarcerated. On redirect, he testified that if Christopher "was an issue," he could keep Christopher away from the house.

Christopher testified that he had been incarcerated for thirteen months. He said that he had complied with services offered in the jail. He said that he had completed the jail's

8

classes on anger management, domestic violence, parenting, cognitive thinking, and substance abuse "three times." He said that DHS knew he was in jail and that no one came to the jail to see him or help him and that he completed everything offered to him.

At the close of the testimony, Christopher moved for a directed verdict, arguing that DHS never had any contact with him while he was in jail and that he had to arrange his own services. The circuit court denied the motion and made the following findings:

> In regard to Mr. Rocha, he's been in jail appears to be from April 27, 2020, and continually until this date. There were some services that were provided. There were some services he obtained through the jail. I would point out that this jail has been in lockdown for the most part during the Covid pandemic during this entire time which is problematic, and we've had a hard time just even setting hearings in this case because of Covid lockdown, so I will make that part of the record in this matter.

> He's had no support in regard to his children. Will continue to have domestic violence problems with regard to the history of this couple. I find . . . in regard to him that there are no further services that we could offer him. It would not be safe to return the children to his custody. It's not in the best interest of the children and time has gotten away from us, even with the additional time that was added in regard to the Covid pandemic. We are beyond our 15 months in this situation. I don't see that any further time would have made any difference in regard to this matter.

> In regard to Mrs. Rocha, again . . . if I see everything here, these certificates and letters I received are March 1, March 29th. There was a Change Point on July 15. There was a Restoration in regard to Mike Prince on March 29. Certificate of Completion on February 19. Harbor House on February 19, Completion of Harbor House. It's all this continual 11th hour trying to comply with what's been asked of her since day one. And when I've asked her to do these things, if there's a problem, we can go back and look at this record and I've been doing it I know over a year where I ask the parents, I ask their counsel, is there anything that [DHS] is not providing? Do they have any criticism of [DHS]? And I immediately act in regard to that, and I don't recall there's ever been any criticism or request of [DHS] that is not being complied with. The saddest thing in regard to this matter is that despite all the efforts in regard to Harbor House and Restoration, we are still continuing to use methamphetamine and there's no more services to offer you in regard to get you to stop using methamphetamines. The fact that you couldn't even spend the 30 minutes for a walk on wonderful day to provide them with a drug screen . . . three days before your hearing is absolutely incredible for this Court. If you want to do

9

everything possible to have your children, I can't imagine why you wouldn't make that 30-minute walk down there to get this drug screen done unless you tested positive and that's what I'm assuming. It would not be safe to return the children because of the methamphetamine use. It would not be in their best interest.

In regard to both parents, we're still in the same situation that we were 18, 24 months ago in regards to -- nothing has been resolved in regard to their problems in domestic violence or in regard to drug abuse. There's been no support from Mrs. Rocha in regard to these children. Neither of these parents have provided any consistent employment or housing other than this 11th hour effort in regard to this matter, and there's been plenty of time. I don't see that any more time will make any difference in returning these children. I find that they're adoptable.

After the circuit court made its ruling, Christopher requested a last visit with the children. The circuit court denied the request and found that it was not in the children's best interest given the therapist's recommendation and Christopher's incarceration.

On April 9, Ashley's father moved to intervene as the natural paternal grandfather of the children. The circuit court denied the motion by order filed April 20. On the same day, the order terminating parental rights was filed, and it reflects that DHS proved the statutory grounds as pled.

II. *Standard of Review and Applicable Law*

We review termination-of-parental-rights cases de novo. *Brown v. Ark. Dep't of Hum. Servs.*, 2015 Ark. App. 725, at 4, 478 S.W.3d 272, 275. An order terminating parental rights must be based on a finding by clear and convincing evidence that one of the grounds stated in the termination statute has been satisfied and that the sought-after termination is in the children's best interest. *Id*. Clear and convincing evidence is that degree of proof that will produce in the fact-finder a firm conviction that the allegation has been established. *Id*. When the burden of proving a disputed fact is by clear and convincing evidence, we ask whether the circuit court's finding on the disputed fact is clearly erroneous. *Id*. A finding is

10

clearly erroneous when, although there is evidence to support it, we are left with a definite and firm conviction that a mistake has been made. *Id.*

In making a "best-interest" determination, the circuit court is required to consider two factors: (1) the likelihood that the child will be adopted and (2) the potential of harm to the child if custody is returned to a parent. *Miller v. Ark. Dep't of Hum. Servs.*, 2016 Ark. App. 239, 492 S.W.3d 113. We have stated,

> [A]doptability is not an element that must be proved but is simply a factor that must be considered in determining the child's best interest. A best-interest finding under the Arkansas Juvenile Code must be based on the consideration of two factors, the first of which is the child's likelihood of adoption. Ark. Code Ann. § 9-27-341(b)(3)(A)(i) (Repl. 2015). Adoptability is not a required finding, and likelihood of adoption does not have to be proved by clear and convincing evidence. *Duckery v. Ark. Dep't of Human Servs.*, 2016 Ark. App. 358, at 5–6. We have previously explained that the Juvenile Code does not require "any 'magic words' or a specific quantum of evidence" to support a finding as to likelihood of adoption. *Sharks v. Ark. Dep't of Human Servs.*, 2016 Ark. App. 435, at 8, 502 S.W.3d 569, 576. The law simply requires that the court consider adoptability and that if there is an adoptability finding, there must be evidence to support it. *See Haynes v. Ark. Dep't of Human Servs.*, 2010 Ark. App. 28, at 4 (reversing a best-interest determination because no evidence of adoptability was introduced, and the court failed to consider adoptability). The fact that adoptability is not a required element is consistent with the rule that termination of parental rights is proper even when there is little likelihood of adoption, if it is in the child's best interest. *McDaniel v. Ark. Dep't of Human Servs.*, 2013 Ark. App. 263, at 4–5.

*Connors v. Ark. Dep't of Hum. Servs.*, 2017 Ark. App. 579, at 3–4, 537 S.W.3d 736, 738–39.

Further, proof of adoptability does not require DHS to provide names of specific adoptive parents or even to provide evidence it has identified such persons at the termination hearing. *Cole v. Ark. Dep't of Hum. Servs.*, 2018 Ark. App. 121, at 5, 543 S.W.3d 540, 543. A caseworker's testimony that a child is adoptable is sufficient to support an adoptability finding. *Id.* Adoptability and potential harm are merely factors to be considered—they are

11

not elements of the cause of action and need not be established by clear and convincing evidence. *Honeycutt v. Ark. Dep't of Hum. Servs.*, 2021 Ark. App. 6, at 8, 615 S.W.3d 741, 746–47. Rather, after considering all the factors, the circuit court must find by clear and convincing evidence that termination of parental rights is in the best interest of the children. *Id.*

### III. *Ashley's Best-Interest Argument*

Ashley argues that DHS failed to present sufficient evidence to support the circuit court's best-interest finding. Ashley relies on *Renfro v. Arkansas Department of Human Services* for this court's admonishment that DHS should offer more than the "bare minimum" as evidence concerning the adoptability prong of the best-interest analysis. 2011 Ark. App. 419, at 8 n.3, 385 S.W.3d 285, 289 n.3; *see also Grant v. Ark. Dep't of Hum. Servs.*, 2010 Ark. App. 636, at 13, 378 S.W.3d 227, 233 (testimony that "all children are adoptable" found insufficient to support a best-interest finding); *Haynes, supra* (reversed and remanded for consideration of adoptability where no evidence of adoptability of the children was introduced).

Ashley argues that the evidence presented was that DHS was never able to find a home during the case in which to place the children together, and the adoption specialist ran a data-matching list that identified only five potential families that would be interested in adopting the children as a sibling group. She claims that it is incredible that DHS would ask the court to believe that it could find an adoptive home for the sibling group when it could not find a temporary foster-care home for the group.

12

Ashley argues that no evidence was presented about the impact that termination would have on the siblings if they were not reunified and adopted together. She argues that relative consideration, particularly the sibling relationship, is a relevant consideration for a best-interest determination. *See Clark v. Ark. Dep't of Hum. Servs.*, 2019 Ark. App. 223, 575 S.W.3d 578 (sibling relationships considered by court; termination of parental rights reversed because best-interest determination was grounded in clearly erroneous factual findings that the grandparents did not want to be involved in the case). Ashley contends that if she had been given additional time to achieve permanency for the sibling group by attaining sobriety, the children would have had a real chance to be reunified as a sibling group. She claims that, more importantly, her father came forward before entry of the termination decision, and he is a relative willing to accept all four children. Under Arkansas law, the rights of a relative are derivative to the rights of the parent. *Burt v. Ark. Dep't of Hum. Servs.*, 99 Ark. App. 402, 261 S.W.3d 468 (2007). Thus, she argues that terminating her rights also served to terminate the rights of any relatives. *Id.* She maintains that as long as she remains the children's mother, she can continue to provide them with the biological connection to their maternal grandfather, who is willing to provide them a home.

Ashley relies on *Caldwell v. Arkansas Department of Human Services*, 2010 Ark. App. 102, wherein the father had never physically abused the child, and this court held that termination of the father's rights endangered the child's relationship with her paternal grandmother. Here, Ashley acknowledges that she needs to work on her sobriety, and she argues that she never physically harmed the children and that the children benefited from Ashley's father, who wants to be a long-term placement to keep the children together.

DHS and the attorney ad litem argue in their joint appellees' brief that sufficient evidence supports the circuit court's best-interest finding. We agree. The adoption specialist testified that an adoption data match resulted in five potential adoptive homes for the children as a sibling group. The specialist stated that this match took into consideration all of the children's trauma history and medical conditions and that she expected DHS would be able to find a permanent family for them. There was also sufficient evidence of potential harm because Ashley failed to comply with the case plan and court orders—Ashley tested positive for methamphetamine less than two weeks before the termination hearing; she failed to maintain stable housing and employment; and she failed to resolve her domestic-violence issues.

Adoptability is only a factor to consider—not an element of termination—and the circuit court considered adoptability. *E.g.*, *Connors*, 2017 Ark. App. 579, at 3, 537 S.W.3d at 739. Evidence of a precise adoptive placement is not required, and neither is evidence that the children be placed in the same foster home before termination. *See id.* Ashley's argument that the circuit court failed to consider how the children would be affected if adopted separately is meritless because the evidence demonstrates only that DHS intended to place the children for adoption as a sibling group. Regardless, Ashley failed to raise this argument at the termination hearing. *Mitjans v. Ark. Dep't of Hum. Servs.*, 2018 Ark. App. 472, 561 S.W.3d 747 (issues not raised below are not preserved for appeal).

There is no merit to Ashley's argument that she had completed some of the services and needed additional time for reunification. Partial compliance with a case plan does not justify reversal if the parent continued to make decisions adverse to the child, such as abusing

illegal drugs and testing positive for drug use. *Hollinger v. Ark. Dep't of Hum. Servs.*, 2017 Ark. App. 458, 529 S.W.3d 242. "[A] child's need for permanency and stability may override a parent's request for more time to improve the parent's circumstances." *Kloss v. Ark. Dep't of Hum. Servs.*, 2019 Ark. App. 389, at 8–9, 585 S.W.3d 725, 730. We note that *Caldwell*, *supra*, is distinguishable from Ashley's case because it involved the termination of the rights of only one parent. Further, the evidence demonstrated that placement with Ashley's father was inappropriate because Ashley was living with him at the time of the termination hearing.

Accordingly, we hold that the circuit court committed no error in determining that it was in the children's best interest to terminate Ashley's parental rights.

IV. *Motion to Withdraw and No-Merit Brief*

Arkansas Supreme Court Rule 6-9(j)(1) allows counsel for an appellant in a termination case to file a no-merit brief and motion to withdraw if, after studying the record and researching the law, counsel determines that the appellant has no meritorious basis for appeal. The brief must include an argument section that lists all circuit court rulings that are adverse to the appellant on all objections, motions, and requests made by the party at the hearing from which the appeal arose and an explanation why each adverse ruling is not a meritorious ground for reversal. Ark. Sup. Ct. R. 6-9(j)(1)(A). Additionally, the brief's statement of the case and the facts shall contain all rulings adverse to the appellant made by the circuit court at the hearing from which the order on appeal arose. Ark. Sup. Ct. R. 6-9(j)(1)(B). In evaluating a no-merit brief, the issue for the court is whether the appeal is

wholly frivolous or whether there are any issues of arguable merit for appeal. *Linker-Flores v. Ark. Dep't of Hum. Servs.*, 359 Ark. 131, 194 S.W.3d 739 (2004).

Counsel for Christopher contends that upon studying the record and researching the law, he has determined that there is no meritorious basis for the appeal, and he addresses the three adverse rulings in his no-merit brief. First, Christopher's motion for a directed verdict is treated as a challenge to the sufficiency of the evidence, *Brunson v. State*, 368 Ark. 313, 245 S.W.3d 132 (2006), and in reviewing the sufficiency of the evidence, this court will review de novo in search for clear error. *See Lewis v. Ark. Dep't of Hum. Servs.*, 2012 Ark. App. 154, 391 S.W.3d 695. The basis for the directed-verdict motion rested on DHS's having no contact with Christopher while he was in jail. The circuit court "shall rely upon the record of the parent's compliance in the entire dependency-neglect case and the evidence presented at the termination hearing in making its decision on whether it is in the best interest of the juvenile to terminate parental rights." Ark. Code Ann. § 9-27-341(a)(4). The circuit court found that DHS had complied with the case plan at every stage, and Christopher did not challenge those findings before the termination-of-parental-rights hearing. We hold that the circuit court's denial does not present a meritorious claim on appeal.

Second, we agree with counsel that the circuit court did not err by denying Christopher's motion for a final visitation. The circuit court found that it was not in the children's best interest to visit Christopher while he remained in jail. Further, the therapist recommended that no visitation occur. The denial of Christopher's request for a final

visitation is not germane to whether the circuit court erred in terminating Christopher's parental rights, and this issue presents no meritorious basis for an appeal.

Third, counsel contends that the decision to terminate Christopher's parental rights does not present a meritorious claim on appeal. The circuit court granted the petition as to Christopher based on four statutory grounds, one of which is aggravated circumstances. Ark. Code Ann. § 9-27-341(b)(3)(B)(ix)*(a)(3)(A)*. DHS is required to prove only one ground for termination. "Aggravated circumstances" includes a determination that there is little likelihood that services to the family would result in successful reunification. Ark. Code Ann. § 9-27-341(b)(3)(B)(ix)*(a)(3)(B)*. To prevail, DHS was required to demonstrate that if appropriate reunification services were provided, there is little likelihood that they could achieve reunification. *Yarborough v. Ark. Dep't of Hum. Servs.*, 96 Ark. App. 247, 240 S.W.3d 626 (2006).

The evidence established that Christopher had made little to no progress on the case plan and was incarcerated at the time of the hearing. The family had been offered services over the course of two foster-care placements, and domestic violence and drug use were not resolved. Having reviewed the record and counsel's brief, we agree that an appeal from the circuit court's decision to terminate Christopher's parental rights would be wholly without merit. Because counsel has adequately addressed the sufficiency of the evidence in the no-merit brief and has complied with the requirements of *Linker-Flores*, *supra*, and this court's rules, we affirm the circuit court's termination order and grant the motion to withdraw.

Affirmed; motion to withdraw granted.

VIRDEN and VAUGHT, JJ., agree.

*Tabitha McNulty*, Arkansas Commission for Parent Counsel, for separate appellant Ashley Rocha.

*Davis Firm, PLLC*, by: *Jason R. Davis*, for separate appellant Christopher Rocha.

*Ellen K. Howard*, Ark. Dep't of Human Services, Office of Chief Counsel, for appellee.

*Janet Lawrence*, attorney ad litem for minor children.