Cite as 2026 Ark. App. 267

# ARKANSAS COURT OF APPEALS

DIVISION I
No. CV-25-752

|  |  |  |
|---|---|---|
|  |  | **Opinion Delivered** April 29, 2026 |
| TEASIA TURNER | | |
| | APPELLANT | APPEAL FROM THE COLUMBIA COUNTY CIRCUIT COURT [NO. 14JV-22-87] |
| V. | | |
| | | HONORABLE DAVID W. TALLEY, JUDGE |
| ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILDREN | | AFFIRMED |
| | APPELLEES | |

**KENNETH S. HIXSON, Judge**

Appellant Teasia Turner appeals from the termination of her parental rights to her children, MC1, MC2, MC4, and MC5, who presently range in age from eight to two years old.[1]  On appeal, Teasia argues that appellee Arkansas Department of Human Services (DHS) failed to prove that termination of her parental rights was in the children's best interest.  Specifically, Teasia argues that termination was not in the children's best interest because there was lack of evidence that the children would be adopted as a sibling group; thus, the children would potentially be separated from each other upon termination.  We affirm.

---

[1]None of the children's fathers are a party to this appeal.

## I. *Relevant Facts and Procedural History*

On December 20, 2022, DHS filed a petition for dependency-neglect and emergency custody of MC1, MC2, MC3, and MC4.[2] The facts concerning the dependency-neglect were contained in an attached affidavit of a family service worker. The affidavit stated that Teasia and MC4 had tested positive for THC six days prior when MC4 was born. The affidavit stated that during DHS's prior involvement with the family, Teasia had also tested positive for THC when MC1 and MC3 were born. The affidavit stated that Teasia was living with the children in a hotel room with one bed, there was little food, and Teasia was unemployed.

On December 20, 2022, the trial court entered an ex parte order for emergency custody of MC1, MC2, MC3, and MC4. A probable-cause order followed on January 13, 2023.

On February 15, 2023, the trial court entered an adjudication order finding that the children were dependent-neglected under "Garrett's Law" and that the allegations in the petition were true, and the children were at substantial risk of serious harm. The trial court ordered Teasia to obtain and maintain stable housing and employment, complete parenting classes, submit to random drug screens, complete a substance-abuse assessment and follow the recommendations, and undergo a psychological evaluation. The goal of the case was reunification with the concurrent goals of adoption and relative placement.

---

[2]At the time the petition was filed, MC5 had not yet been born. As noted later in this opinion, during the dependency-neglect proceedings, MC3 was placed in her father's custody, and Teasia's parental rights were not terminated as to that child.

On June 6, 2023, the trial court entered a review order finding that Teasia was not in compliance with the case plan. The trial court ordered Teasia's visitation to be supervised. The trial court noted that the children were not placed together at that time but it ordered sibling visitation and found that DHS had made reasonable efforts to reunite the siblings and to allow contact, consistent with Ark. Code Ann. § 9-28-1003(d). The trial court also found that DHS had made reasonable efforts to provide numerous services to achieve reunification. The goal of the case remained reunification with the concurrent goals of adoption and relative placement.

On August 15, 2023, the trial court entered a review order finding that Teasia was in compliance with the case plan. The goal of the case remained the same, and the trial court gave Teasia unsupervised day visits.

On January 2, 2024, the trial court entered a permanency-planning order stating that the goal of the case remained the same. In the permanency-planning order, the trial court found that Teasia had made measurable progress and was diligently working toward reunification.

In a February 15, 2024 review order, the trial court ordered MC1 and MC2 to begin a trial home placement with Teasia while MC3 and MC4 remained in foster care "to not overwhelm [Teasia] with all the children at one time." On March 21, 2024, the trial court entered an order starting a trial home placement of MC3 and MC4 with Teasia.

On July 15, 2024, DHS filed a petition for dependency-neglect for all the children, which included MC5, who was born in March 2024. In an attached affidavit, a family service

3

worker alleged that the worker had taken MC4 to the doctor because he was losing weight and not meeting his developmental milestones. MC4 was subsequently hospitalized due to severe dehydration and malnourishment, which necessitated immediate treatment. MC4 was so unhealthy that his ribs were easily seen and he had loose skin from muscle wasting. The affidavit stated that Teasia was unwilling or unable to meet the children's needs for food, clothing, shelter, and medical care; as a result, an emergency hold was exercised on all five children.

On July 16, 2024, the trial court entered an ex parte order for emergency custody for all five children. On July 19, 2924, the trial court entered a probable-cause order that continued the children in DHS custody subject to Teasia's supervised visitation.

On October 9, 2024, the trial court entered an adjudication and review order. In that order, the trial court found the children dependent-neglected due to medical neglect and inadequate supervision. The goal of the case was reunification, and Teasia's visitation remained supervised.

On November 20, 2024, DHS filed a motion to terminate reunification services. In that motion, DHS alleged that the children were subjected to aggravated circumstances in that there was little likelihood that continued services to the family would result in reunification.

On February 5, 2025, the trial court entered a combined permanency-planning order and order terminating reunification services. In that order, the trial court found that at the hearing on DHS's motion, DHS had proved by clear and convincing evidence that the

children were subjected to aggravated circumstances in that there was little likelihood that continued services to the family would result in reunification. The trial court specifically found that Teasia had been offered two years of reunification services and was not in compliance with the case plan. The court granted DHS's motion to terminate reunification services and changed the case goal for MC1, MC2, MC4, and MC5 to termination of parental rights and adoption. The case goal for MC3 was placement with her father. The trial court stated that Teasia was to make arrangements with DHS if she wanted visitation.

After a review hearing held on June 20, 2025, the trial court placed MC3 in the custody of her father, and the case was closed as to MC3. The case goal for MC1, MC2, MC4, and MC5 remained termination of parental rights and adoption.

On June 24, 2025, DHS filed a petition to terminate Teasia's parental rights as to MC1, MC2, MC4, and MC5. DHS alleged that it was in the children's best interest for Teasia's parental rights to be terminated and stated that there were persons interested in adopting the children should the trial court grant the petition. As statutory grounds, DHS alleged failure to remedy, subsequent factors, and aggravated circumstances. *See* Ark. Code Ann. § 9-35-325(b)(3)(B)(i)*(a)(1)*, (vii)*(a)* & (ix)*(a)(3)*. The termination hearing was held on August 8, 2025.

Roquayyah Blake, the DHS caseworker assigned to the case, testified at the termination hearing. Ms. Blake testified that MC1 was currently placed in a therapeutic foster home and was doing fine in the home. However, while in daycare, there were instances when MC1 was sent home for being aggressive and disruptive. Ms. Blake stated that MC2,

MC4, and MC5 were all in the same placement in a foster home and were doing fine and adjusting well with the family.

Ms. Blake stated that the children were originally removed from Teasia's custody due to inadequate housing and because a third child had tested positive for drugs at birth in violation of Garrett's Law. Ms. Blake stated that after the children's removal, Teasia obtained stable housing and was visiting the children and that she was eventually given a trial placement with the children.

However, the trial placement had to be terminated after Ms. Blake visited Teasia's home in July 2024 and found that MC4 was visibly and severely malnourished. Ms. Blake took MC4 to the doctor, and he was transported to Arkansas Children's Hospital, where he was admitted for treatment of malnourishment and dehydration.

Ms. Blake stated that after the children were removed the second time, DHS continued to offer Teasia services. Ms. Blake stated that individual counseling was part of the case plan but that Teasia did not comply with counseling because she said she did not need it. Ms. Blake also stated Teasia had allowed her SNAP (Supplemental Nutrition Assistance Program) benefits to lapse. Ms. Blake stated that DHS asked that reunification services be terminated in November 2024 because throughout the duration of the case, Teasia would complete the case requirements only if asked or initiated by DHS. Ms. Blake stated, "As far as her going to do it on her own, that wasn't anything that was done." Ms. Blake also stated that Teasia never accepted any accountability as to why the dependency-neglect case was opened.

Ms. Blake stated that at the time reunification services were terminated by order of the trial court, Teasia had been living at her own residence, but she then moved in with her mother. Ms. Blake stated that Teasia's mother's residence has two bedrooms and no running water and that Teasia's two older brothers also lived there. Ms. Blake was unaware of whether Teasia had obtained stable housing since then. Ms. Blake stated that she informed Teasia that she could make arrangements to continue visiting the children after reunification services were terminated but that Teasia had not visited the children during the eight months leading up to the termination hearing.

Ms. Blake testified that she could not recommend returning the children to Teasia and that she did not believe there were any services DHS could provide to achieve reunification. Ms. Blake believed the children would be in danger if returned to Teasia's custody due to Teasia's inadequate and unstable housing, lack of motivation to meet the children's needs, and lack of coping mechanisms to replace her use of THC. Ms. Blake noted that when the children were returned to Teasia for a trial placement, MC4 lost weight and became severely malnourished. Ms. Blake believed that it was in the best interest of the children for Teasia's parental rights to be terminated.

Teasia was the only other witness to testify. Teasia stated that she lives in a house next to her mother. She stated that she was previously employed at Dairy Queen but was fired, and after that, she worked at Exxon until MC5 was born. Teasia stated that she is currently self-employed selling center caps and license plate covers for automobiles. Teasia stated that she makes $700 to $800 a month at this job. She stated that her rent is $250 a

month, and her utilities are about $150. Teasia stated that she completed five counseling sessions but stopped going because she was unable to pay for the sessions. Teasia stated that she no longer uses illegal drugs and that she had tested negative on her drugs screens. Teasia stated that she had been trying to arrange for visitation with her children but that they were living in a different county, and she never had a car.

Teasia testified that she was ready to have her children and stated, "I'm all they've ever had." She stated, "Taking care of five kids is not easy on your own with no help and I didn't have help from the Department." Teasia stated that she now has a support system, which includes her mother and coworkers. Teasia stated that she has made every effort to comply with the case plan and have her children returned to her.

After Teasia testified, the trial court noted that there had been a lack of evidence on the children's adoptability. Without objection, Ms. Blake was recalled to testify about adoptability.

Ms. Blake opined that she believes all four children are adoptable. She stated that although there were some issues with MC1 at daycare, there were no issues in his foster placement. Ms. Blake stated further that the other three children, who were in the same foster home, were all doing well and were happy in their placement. Ms. Blake stated that the children have no medical or psychological problems that would impede their adoption.

At the conclusion of the termination hearing, the trial court announced that various statutory grounds had been proved and that it was granting DHS's petition to terminate Teasia's parental rights. The trial court stated further:

8

The Court finds that these children are with and in a safe place right now and even if the current placements do not provide a permanent place, that there's nothing—despite the issues with [MC4] that caused the second removal—that there are no health concerns that would be a road block to a successful placement and all of the children are adoptable. Obviously, it's more problematic about trying to adopt them together, but that's for another day, but the children are adoptable.

On September 8, 2025, the trial court entered an order terminating Teasia's parental rights to MC1, MC2, MC4, and MC5. The trial court found that one of Teasia's children suffered malnourishment while in her care and that Teasia had not completed counseling, failed to maintain suitable living conditions for the children, lacked motivation to complete the services offered by DHS, and had not visited the children for more than eight months. The trial court found clear and convincing evidence of three statutory grounds under Ark. Code Ann. § 9-35-325(b)(3)(B). Specifically, the trial court found that DHS proved failure to remedy, subsequent factors, and aggravated circumstances. The trial court also found by clear and convincing evidence that termination of parental rights was in the children's best interest, and the court considered the likelihood that the children would be adopted as well as the potential harm of returning them to Teasia's custody as required by Arkansas Code Annotated section 9-35-325(b)(3)(A)(i) & (ii).

This appeal followed.

II. *Standard of Review*

The intent behind the termination-of-parental-rights statute is to provide permanency in a child's life when it is not possible to return the child to the family home because it is contrary to the child's health, safety, or welfare, and a return to the family home cannot be

9

accomplished in a reasonable period of time as viewed from the child's perspective. Ark. Code Ann. § 9-35-325(a)(3). A trial court's order terminating parental rights must be based on findings proved by clear and convincing evidence. Ark. Code Ann. § 9-25-325(b)(3). Clear and convincing evidence is defined as that degree of proof that will produce in the fact-finder a firm conviction as to the allegation sought to be established. *Posey v. Ark. Dep't of Health & Hum. Servs.*, 370 Ark. 500, 262 S.W.3d 159 (2007). On appeal, the appellate court reviews termination-of-parental-rights cases de novo but will not reverse the trial court's ruling unless its findings are clearly erroneous. *Id.* A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id.*

In order to terminate parental rights, a trial court must find by clear and convincing evidence that termination is in the best interest of the juvenile, taking into consideration (1) the likelihood that the juvenile will be adopted if the termination petition is granted; and (2) the potential harm, specifically addressing the effect on the health and safety of the child, caused by returning the child to the custody of the parent. Ark. Code Ann. § 9-35-325(b)(3)(A)(i) & (ii). The order terminating parental rights must also be based on a showing of clear and convincing evidence as to one or more of the grounds for termination listed in section 9-35-325(b)(3)(B).

III. *Best Interest*

On appeal, Teasia does not challenge the trial court's findings as to the statutory grounds supporting termination. Instead, Teasia argues that there was insufficient evidence

that termination was in MC1's, MC2's, MC4's, and MC5's best interest. Teasia specifically argues that termination was not in the children's best interest because there was lack of evidence that the children would be adopted as a sibling group, thus potentially separating the children from each other upon termination.

Teasia acknowledges that under Ark. Code Ann. § 9-35-325(b)(3)(A), in deciding whether termination is in the best interest of the child, the trial court must consider the likelihood of adoption and potential harm caused by returning the child to the custody of the parent. Teasia asserts, however, that these are not the only factors to be considered in making a best-interest determination and that our court has looked at other factors, such as the impact termination has on familial relationships. *See Caldwell v. Ark. Dep't of Hum. Servs.*, 2010 Ark. App. 102.

In support of her argument, Teasia cites Ark. Code Ann. § 9-35-301(2)(A) (Supp. 2025), which contains the public-policy consideration to "preserve and strengthen the juvenile's family ties when it is in the best interest of the juvenile." Teasia also cites Ark. Code Ann. § 9-28-1003(a) (Supp. 2025), which provides that children involved in dependency-neglect cases are entitled to "special safeguards, resources, and care," and subdivision (b)(5), which provides that children are entitled to "be informed about and have involvement when appropriate with his or her birth family and siblings." Teasia states further that the uniqueness and importance of sibling relationships is acknowledged in the provisions of Ark. Code Ann. § 9-28-1003(c). Finally, Teasia relies on *Clark v. Arkansas Department of Human Services*, 2016 Ark. App. 286, 493 S.W.3d 782, where we stated that

11

one factor the court must consider in determining the best interest of the child is whether the child will be separated from his or her siblings.

Ms. Blake testified that MC1 was placed in a separate foster home from his three younger siblings and that MC1 had exhibited behavioral problems that had resulted in his being placed in multiple foster homes throughout the case. Teasia states that although there was testimony that all four children are adoptable, there was no testimony that there was a plan to find a single adoptive home for all the children. Teasia asserts further that because during the dependency-neglect proceedings DHS was unable to find an appropriate foster care placement for the sibling group as a whole, it is unlikely there will be an adoptive home for all four children upon termination of her parental rights. Teasia notes that in its comments from the bench, the trial court stated that finding an adoptive home for all four children would be "problematic" but that was an issue "for another day." Teasia argues that there were no protections afforded to ensure that the children would be able to preserve their sibling bonds if adopted separately, and she contends that the trial court erred in failing to weigh how the termination decision would affect the children's relationships with each other. Teasia thus posits that the trial court's analysis was incomplete, and if the decision stands, the children could potentially lose their sibling bonds. In light of these considerations, Teasia argues that DHS failed to prove that termination was in the children's best interest and that the termination order should be reversed.

We do not agree with Teasia's argument. A similar argument was raised but rejected by out court in *Wilkerson v. Arkansas Department of Human Services*, 2024 Ark. App. 88, at 5–6, 684 S.W.3d 319, 322–23, where we explained:

> We now turn to Wilkerson's point about the children's potential separation from one another by adoption. She contends that the siblings' relationship should have been considered as part of the best-interest analysis. She cites *Caldwell v. Arkansas Department of Human Services*, 2010 Ark. App. 102, and *Clark v. Arkansas Department of Human Services*, 2016 Ark. App. 286, 493 S.W.3d 782. Neither present meritorious grounds for reversal.
>
> First, we reversed the termination in *Caldwell* because we held that terminating the parental rights of only the father would not serve to achieve permanency and that the termination of the father's rights endangered the child's relationship with her paternal grandmother, which the circuit court found to be the most stable influence on the child. Nor is *Clark* applicable: it concerned an appeal of a custody award between two parents—not a termination of parental rights. The Juvenile Code does not require certainty, let alone a "guarantee," that siblings be adoptable as a group. *Corley v. Ark. Dep't of Hum. Servs.*, 2018 Ark. App. 397, at 9, 556 S.W.3d 538, 544. Evidence of a precise adoptive placement is not required and neither is evidence that the children be placed in the same foster home before termination. *Rocha v. Ark. Dep't of Hum. Servs.*, 2021 Ark. App. 454, at 15, 637 S.W.3d 299, 309.
>
> The intent behind the termination-of-parental-rights statute is to provide permanency in a child's life when it is not possible to return the child to the family home because it is contrary to the child's health, safety, or welfare, and a return to the family home cannot be accomplished in a reasonable period of time as viewed from the child's perspective Ark. Code Ann. § 9-27-341(a)(3).[3] At the time of the termination hearing, the children had been out of Wilkerson's custody for over a year, and Wilkerson had not made significant progress toward reunification. After a de novo review, we are not left with a definite and firm conviction that a mistake has been made.

In the present case, the trial court demonstrated its concern about the sibling relationship in its review orders where it found that although the siblings were not placed

---

[3]This provision is now codified at Ark. Code Ann. § 9-35-325(a)(3).

13

together, DHS had made reasonable efforts to reunite the siblings and to allow consistent contact. In those review orders, the trial court also ordered sibling visitation. As a result of MC1's behavioral issues, he evidently needed therapeutic foster care and could not be placed with the other three children in their foster home. The trial court found that all four children are adoptable and acknowledged that adoption of all the children as a sibling group could be problematic. The trial court nevertheless found, considering all the relevant evidence, that termination was in the children's best interest.

As in *Wilkerson*, *supra*, we are not left with a definite and firm conviction that a mistake has been made. As stated in *Wilkerson*, the Juvenile Code does not require certainty that siblings be adoptable as a group. In finding that termination was in the children's best interest, the trial court relied on the evidence that MC4 suffered severe malnourishment during Teasia's trial placement with the children and that Teasia had not completed counseling, had failed to maintain suitable living conditions for the children, lacked motivation to complete the services offered by DHS, and had not visited the children for more than eight months.

Having reviewed the entire record, we hold that the trial court did not clearly err in finding that termination of Teasia's parental rights was in MC1's, MC2's, MC4's, and MC5's best interest. Accordingly, we affirm the order terminating Teasia's parental rights.

Affirmed.

KLAPPENBACH, C.J., and GLADWIN, J., agree.

*Jennifer Oyler Olson*, Arkansas Commission for Parent Counsel, for appellant.

*Ellen K. Howard*, Ark. Dep't of Human Services Office of Chief Counsel, for appellee.

*Linda J. Hamilton*, attorney ad litem for minor children.